The United States Court of Appeals for the Ninth Circuit is now in session. Thank you. You may be seated. Good afternoon. It's a pleasure to be with you here today. Thank you for coming in from out of town for this hearing. As you know, this is the time set for Immigrant Defenders Law Center v. Kristi Noem. I think if you're ready to proceed, we're ready to proceed. Judge Nelson, can you hear us? Yes. Can you hear me? Yes. Thank you. Good afternoon, Your Honors. Sarah Welch for the Federal Defendant Appellants. I will try to reserve four minutes for rebuttal. May it please the Court. Last month, the Court largely stayed the District Court's order entering interim relief against the re-implementation of MPP. The Court should now reverse the District Court's order based on both the arguments presented at the stay stage and our additional arguments presented at this stage. One change is that IMDEF now squarely disavows a diversion of resources theory of standing. That leaves little to its remaining standing arguments. For another, we've presented additional threshold arguments under the related statutory jurisdictional bars in AUSC 1252A5 and B9, which bar IMDEF's statutory claims. The other additional arguments that we've presented at this stage show that IMDEF is trapped between two separate dilemmas of its own making. The first is a dilemma between IMDEF's complaint and its final agency action argument. IMDEF challenges MPP's re-implementation as a freestanding, separate, final agency action. We don't think that's a correct argument, and we think that their request for relief should fail for that reason. But if they are correct on that, that it is a separate agency action, that's a problem for IMDEF because it means that it's not an action that IMDEF challenges in its complaint and it's not something on which IMDEF can receive relief, ultimately, at final judgment. Courts can't award interim relief on a claim or against an agency action. It's not presented in the underlying complaint. The second dilemma that is now crystallized is between IMDEF's statutory arguments and its ripeness arguments. IMDEF's statutory arguments invoke and purport to depend on the effects of re-implementing MPP, but we have yet to see any effects of re-implementing MPP on the ground now. So either IMDEF's challenge is not yet sufficiently concrete to be ripe, or its statutory argument is ultimately that no matter the facts on the ground at any given moment, the contiguous territory return authority, when exercised with respect to Mexico, is always unlawful. So the INA is inherently self-imposed. Counsel, can I start you off on the ripeness issue? It seems as if the government is trying to have it both ways. On the one hand, the re-implementation is predicated on the notion that circumstances at the border changed, making it suitable to be able to re-implement. But we have yet to hear what those circumstances are. Maybe you might clarify that in your argument today. But then, on the other hand, you fault IMDEF for not raising something that's particularly happening at the moment, something concrete that would warrant our review of these claims right now. So can you help me clarify that point? Sure. I don't have anything additional to offer in elaboration of the January 21st press release announcing DHS's view that conditions at the border had become suitable for re-implementation of MPP. We haven't had additional factual development on that, so there's nothing else in the record that I can point the Court to on that point. And just real quick, is there any reason for a delay in what I would assume the re-implementation would look like? If I'm understanding the question, the agency understands itself to be free now to re-implement MPP on the ground in light of the Court's order last month with respect to everyone except IMDEF's current and future clients. So the agency's understanding is that it's free to do that as of a month ago. Is that responsive to your question? I'm sorry, and maybe I didn't ask it. Has there anybody been enrolled in the MPP policy? I don't have additional facts to offer on that point either. I'm not aware. So when you say, and I'm sorry for interrupting you, but when you say you have no additional facts, I think when we asked you last month, remind me, was the answer no or you didn't know? Prior to the District Court's stay order, which was the four months during which, between the January 21st press release and the District Court's stay order, the representation that we had made, which is my understanding of the facts, is that MPP had been used on a limited basis. So there was a low but non-zero number of individuals who had been enrolled in MPP prior to the stay. And you didn't know what that number was? I did not know what that number was. So we don't know what low means? Correct. Low enough that IMDEF has not encountered anyone who has been enrolled in MPP at least. Thank you. Sorry, you can go ahead and continue to respond to that. Is there a way to define that? I mean, they wouldn't know who's been enrolled, right? I mean, can you tell us anything about how it's actually being used? Even on the low number, I mean, what happens? They're showing up at the border and they're just turned away? They're processed through the ordinary MPP enrollment process, so they're screened to ensure that they meet the criteria for MPP and then are given a date for a court appearance and a port of entry at which they should show up for that court appearance. So just the normal, ordinary MPP process. I apologize. I don't have a specific number to offer. Well, and the only reason I'm asking more questions is I don't I'm not entirely sure why that's hard to figure out. I mean, two things. I'm trying to figure out whether only the government would have access to that. I take it this is not public. Now, like there's nothing about a public notice of a hearing that would suggest. Then it notices the public that there's that that immigrant would be in the MPP process. I assume that's correct. I'm not aware of anything that's different about the public calendar for a given hearing that would that would reflect that. If the court needs additional facts, I expect that's something that will be developing before the district court. And if the court wanted to order a supplemental briefing, I think that would perhaps be the best way to offer any additional facts that the court finds necessary at this point. I would emphasize that that showing ripeness, showing that MGEF has the right to be in court on this matter is their job. So they they do need to show the facts indicating that they are suffering a present injury and that there's any limited. Was there any limited jurisdictional discovery? Did they ask for any of this documentation or it just came up? There was no limited jurisdictional discovery. Not that I'm aware of, Your Honor. One more on ripeness. Is there anything different about your ripeness argument versus your cognizable injury argument understanding? It seems like those sort of roll in. But I want to know because you didn't raise it at the motion stage. Now you've raised it. And I'm trying to figure out if there's anything new that the ripeness argument addresses that cognizable injury hasn't already addressed. So there's, of course, quite a bit of overlap between the injury prong of standing and the constitutional portions of the ripeness inquiry. But we are additionally making the prudential ripeness arguments that there's just not a sufficiently concrete dispute. The facts on the ground aren't sufficiently developed for this dispute to be to be susceptible to judicial review with respect specifically to the re-implementation action that MDEF has chosen to argue is a separate agency. Well, let me let me press you on that, counsel, because this follows President Trump's executive order indicating reintroduce MPP. And from what I understand between the press release and the executive order, there is no contemplation of a different policy or any new direction to it. It's just we already set this up before in 2019. Do it again. And MDEF has come in with evidence of certain harms that arose as well as I think the district court noted that there's it can very be it can be quickly ramped up. Why doesn't that create enough of the imminence to say, well, nothing different about this program is going to happen. We know what happened before. Why why doesn't that make it sufficiently right for us to consider these issues now? So I think I would point to the fact that the facts that MDEF is relying on are its allegations and its complaint filed in December 2021, as well as the October 2021 termination memoranda produced by DHS. And all of those facts are four years old and significant things have changed in the interim. For example, COVID is no longer a pressing concern. The authorities that the government is using at the border are substantially different. So one of the one of the features, one of the aspects that was significant to those findings was that there was a large population of individuals at the border who were sort of attempting to cross the border daily. And that's related to the policies that were in place at the time. The U.S. is now using different policies to secure the border. COVID is no longer a concern. So that relates to the sort of health and safety concerns that were prominent in those analyses. So there's reason to think that the facts have changed in the last few years. You're correct, Your Honor, that the guidance that is being used is not different. And the executive order just directed DHS to resume use of MPP when it became appropriate. And DHS found that it had become appropriate. So I would push back on the idea that the executive order was creating, was instructing DHS to create any new final agency action. And just given that it was instructing DHS to resume MPP and given that the Northern District of Texas's stay of the last administration's attempt to rescind MPP meant that MPP remained the policy of DHS. So it didn't need to take any new actions that could be separately cognizable as a final agency action in order to put MPP back into effect, in order to start it. I guess this might be a good time to switch over to that issue. Let me ask you this first. What is the status of litigation proceedings in front of the Northern District of Texas? Because as I understand it, the stay was issued in December of 2021. And at that point, there's been no merits review of the rescission decision itself. And so as I read it, that's the final agency action that preceded the executive order here. It hasn't been, you know, invalidated or anything else. It's just been stayed. So what's the status of that case? So I'll try to spend a brief moment walking through that case's complicated procedural history. So the 2021 district court decision was a preliminary injunction followed by a June 2021 termination memo. That was the case that went up to the Supreme Court and was reversed. In 2022, it came down and reviewed, the district court reviewed the October 2021 rescission memo, which superseded and withdrew the June rescission memo. So the October rescission memo is the only one that's still in effect and operative or would be absent the 2022 stay. The government then appealed that stay and dismissed its appeal, meaning that the 705 stay remains in effect. So the current status of the litigation is that dispositive motions have been briefed and were ripe for a decision as of January when both parties moved to stay the case while DHS reconsidered its position with respect to the October 2021 memoranda, rescinding MPP. And the most recent action is that I believe at the beginning of this month and last month, the parties filed a status update asking the court to continue to stay in effect, I believe through the end of September. While the parties continue to discuss the resolution of the case. Okay. And is it correct that Judge Bernal was planning to move forward with discovery, which could include this materials relevant for jurisdictional questions? Is that a possibility of what my review of the district court docket? So, yes, your honor, discovery is set to end in November in the district court here with dispositive motions due in December. I didn't know if that was stayed while we were doing this. It's not. OK, I'd like to ask you some questions on the MPP and the contiguous territory return provisions of the INA. Would you agree that they are an alternative to detaining non-citizens inside the United States? I would agree with that, your honor, yes. And I take it you would also agree that the fact that non-citizens must be enrolled in MPP implies that the government exercises some degree of control and oversight over this program. Would you agree with that? Certainly over the program, your honor, yes. Individuals have to be screened to ensure that they are eligible for MPP. For example, particularly vulnerable aliens, those with a credible fear of torture in Mexico are not eligible to be enrolled in MPP. And so would you also agree that the asylum seekers rights under the INA do not go away once they are sent back to Mexico after being enrolled in the MPP? Certainly, your honor, individuals still have the right to apply for asylum and maintain an asylum application. So the reasons I ask those questions, and if that is the case, why shouldn't cases from this circuit involving the INA's right to counsel, such as Orontes, inform our assessment in this case? I think they are relevant to the court's assessment in that in those cases, the government is controlling the conditions of detention. The government decides on what circumstances, under what conditions individuals who are detained can speak to their attorneys. It decides the visiting hours. It decides when they go to their hearings. And that sets up a contrast. The way that it's relevant is as a contrast to the individual's freedom of movement in MPP. So when they're enrolled in MPP, they're given a hearing date and instructed which port of entry to appear at and at what time. They're then free to be in Mexico to speak to anyone they want to about anything at any time up until they arrive at the port of entry. And at that point, they are returned to DHS custody and transported to their hearing and returned back to Mexico when the hearing is complete. So I think those cases are relevant as a contrast, because what's driving the detention cases is that the government is in control of who those people talk to and when. And so you agree that the government still must ensure their right to apply for asylum with the ability to have counsel of their choice being safeguarded. We think we think all three statutes work together and what the way that they work together is that the government is allowed to return individuals to Mexico, even if that imposes incidental effects on their other applications, even if someone may choose to not maintain their asylum application because they're waiting in Mexico rather than in the United States. And even if it's more difficult to talk to your attorney when you're not physically present in the United States, we think that's the way to give all three statutes effect and the way not to give them all three effect, not to read them together, is to say that conditions in Mexico, whenever they whenever they create incidental effects on other rights. What if the effects are not incidental? You know, what if you have a program that, you know, hypothetically someone is in a territory, but they're not able to actually attend their hearings, for example, or bring witnesses or or or access counsel at any time, which you would agree that because those are other statutory rights that have that are also in the INA, that even if the government is not controlling the conditions in Mexico, that would that would be a problem, wouldn't it? Wouldn't that be in violation of the INA as well? So we think those those individuals would have the ability to raise those claims in their removal proceedings, including in a motion to reopen if if needed. And that I will. But I'm starting just with the basic threshold point of statutory obligations, because I think your point in distinguishing some of these cases was that because the government was controlling the detention center. But it seems to me that the obligation extends further than that. If the government chooses to set up a contiguous territory program, and I'm asking if you agree with that. So I think I think our argument is consistent with the idea that in an extreme case where there were unusual conditions in the territory to which individuals were being returned that made them unable to exercise those rights, that that would be a different circumstance. What what we think is can't be the case, can't be the right way to read all three statutes is for ordinary conditions in Mexico or even conditions in Mexico that are present on many occasions to take the contiguous territory return authority off the table. And one one way that I've thought about that that's helpful for me is as as an analogy to the Supreme Court's Quarles decision in the categorical approach context where the court was evaluating the generic definition of a crime. And it said if if in many states their definition of this crime wouldn't categorically match with the generic definition, that would mean that ACCA is self-defeating. And that can't be the right reading. So it can't be the case that if conditions that are present in Mexico most of the time or all of the time or even much of the time would take the contiguous territory return authority off the table, that that just can't be the right way to read all three statutes together because it would make the INA self-defeating, giving with one hand what it takes away in many, most or all circumstances with the other hand. So so that leaves the possibility that some extreme circumstances would create a burden on the other rights that would mean that the government can't exercise contiguous territory return. For example, say Mexico is having a civil war at a given moment, perhaps contiguous territory return is not available in that circumstance. But something like ordinary conditions can't be enough to take that authority off the table. I see I'm close to my time, so I'll reserve the rest of my time. I know you want to reserve your time, but I'll give you a few extra minutes in your papers. I think you seem to be critical of the district court here for issuing a universal Section 705 stay. But it looked like for me in your papers, you seem to take no issue with the universal nature of the Section 705 stay in the Northern District of Texas case. So I just wanted to give you an opportunity to respond why would the universal Section 705 stay be appropriate there, but not here? Your Honor, we did argue in the Northern District of Texas that a universal 705 stay was not appropriate there either. The only reason that we're treating it differently is because that is in effect and we no longer have the opportunity to appeal that stay because the government dropped its appeal several years ago. So we don't think it was appropriate there either, but we are complying with the court's order as we must. So our arguments are very consistent between both. And so if that is true for the Northern District case, though, why wouldn't it be true for our case? The 705 universal stay. Well, we we've pressed the same arguments in both cases, Your Honor, that that they shouldn't be universal. And it's become even more clear post CASA that this form of equitable relief should be limited to the parties before the court. Let me ask about that, because CASA expressly backed away from addressing anything APA related and several courts have danced around this issue of what are the differences with APA relief versus injunctive relief of their kinds? Why should we map CASA onto this case in a party specific sort of way when, I mean, wouldn't you agree APA relief really is different in a certain way? When you vacate an agency decision, it's not in a party specific kind of manner. It's because the agency violated some procedural mechanism by which it came to its decision. And so it has a chance to do a do over, for example. And that's that doesn't really map very well onto injunctive relief. Why should we map CASA onto APA relief? So CASA explained what what the court held is a general principle of equity, which is that courts offering equitable remedies limit those remedies to the parties before them instead of instead of creating remedies that are universal in scope and apply by which I mean they apply to non-parties. So our argument is is that Section 705 is a form of equitable relief, meaning that the equitable principle announced in CASA applies to that to that form of equitable relief. So not because APA relief is exactly the same as a preliminary injunction. We agree it's different. But because it's governed by the same principles of equity. We think that's clear from the text of 705, which references irreparable harm, which brings up equitable principles. And we think that's also evident from the fact that courts apply the exact same four factor test, which the Supreme Court has said in Starbucks, is a derivation of principles of equity governing when relief is available. The same that same four factor test applies both to preliminary injunctions and to 705 relief. And let me rephrase my question. So would we be creating a circuit split of some sign by going the way we did in our preliminary order if by issuing a more limited stay? I don't believe that another circuit has said that Section 705 relief is properly universal. And if the Fifth Circuit said that, I'm now struggling to think if they said that in in their Alliance for Hippocratic Medicine case. But at minimum, it was pre-CASA and the Supreme Court, of course, reversed that decision as well. Thank you. Thank you. Good afternoon, Your Honors, and may it please the court. Tess Helgarn on behalf of Plaintiff Appellee Immigrant Defenders Law Center. So I'd like to start by reframing the question before the court today, which is narrow. Did the district court abuse its discretion in granting a Section 705 stay? And the parties agree on the standard of review here. If the district court got the law right, the remaining standard is deferential. The district court's application of law to facts is reviewed for abuse of discretion and findings of fact are reviewed for clear error. And we are looking at the facts on the record in this case. So government counsel talked about some of the uncertainties in the record. I would point out that plaintiffs did request discovery regarding the MPP 1.0 re-implementation and the discovery procedures before the district court, and the government refused to produce documents. So what we have on the record is what we have. Wait, wait, can we back up on that? I mean, I guess I don't want to delve into it too much, but when you say they refused to produce documents, did they refuse to produce documents of the numbers that were being subject, that were in the MPP program? They objected to our request for production of any documents pertaining to the MPP 1.0 re-implementation. Oh, well, at one point, wait, is that and that's the issue here. When you say 1.0 re-implementation, there's just so many of them. I want to make sure we're talking about the same thing. What was the basis? Did you move to compel? I guess I'm I mean, I'm not trying to dig into the district court, but as I understand it, discovery is supposed to end in a month or so. Yes, discovery is set to end in September. And we sent those discovery requests pertaining to the re-implementation after we moved for a stay of the re-implementation. We did not move to compel, but defendants objected to those requests for production. And just to clarify what we're talking about here, because there are moving pieces, right? We are talking about when I say the re-implementation of MPP 1.0, I'm choosing my words carefully because that is the narrow policy that Plaintiff MDef is challenging in this case. It is not the contiguous territory return authority under the INA, and it may not even be every implementation of Remain in Mexico, but it is the 2019 implementation of the migrant protection protocols, which is precisely the version that was initially challenged in this case. And that is precisely the version that the government has announced it is January 21st, 2025 announcement. So the operating guidance is the same. So, counsel, why do you think it's sufficiently right for us to address that now? What do you understand the facts on the ground to be to create an eminence of harm, of concrete harm? Yes, Your Honor. So the district court correctly concluded that both constitutional ripeness and prudential ripeness was met with the facts and the record. So defendants' own statements confirm that MPP 1.0 was set to be re-implemented immediately with the same 2019 guidance. And indeed, absent the stay from the district court, defendants represented in the Texas v. Biden, now Texas v. Trump case, that the policy would have been up and running again by July 30th. So there was a decision to actively put the policy back in place. And this makes it fit for a judicial decision. And we will... Counsel, wait, can I back up? Because right now, the government has only stayed as to you. I mean, the stay is only effect as to you as a plaintiff, right? So I think what we just heard from the government is they feel free to re-implement this, I don't know, 99.9% of the way. And that hasn't happened yet. So I guess I'm trying to say, I mean, you seem to say that as... I know you were saying that was a representation by July 30th, but clearly that didn't happen, right? Are you disputing that? Did that happen by July 30th? No, Your Honor, because the stay was granted by the district court and operated in that time. So it was not... Well, yeah, but then when we issued our ruling, that stay was stayed. So there's nothing right now, or at least there hasn't been anything since July 18th. Are you just saying that that stay pushed back to July 30th deadline? I mean, they could implement it right now. In accordance with this court's order, yes. What I was saying was that when reviewing the district court's findings on ripeness, we look to the district court's decision and on the record there, what we have are what defendants represented, which is that they were planning to fully implement the program by July 30th. Of course, intervening litigation from this court interrupted that timeline. And so I defer to government counsel on where they are with the program now. What the district court did correctly consider was the evidence in the record, which was not simply evidence of prior harm, although that is relevant legally, but also the new declarations that were submitted from immigrant defenders that are new evidence in the record. And so the district court correctly found that IMDEF showed imminent irreparable harm based on the facts before it, the facts that this was exactly the same policy. There's not new implementing guidance. It's the same implementing guidance that they're seeking to reinstate. And the district court correctly looked to defendant's own statements in the October 2021 termination and explanation memos, where then-Secretary Mayorkas points to many of the same procedural issues with the implementation of MPP, violations of access to counsel, issues with notice, issue with attending hearings, many of the same issues that IMDEF details in its complaint. And indeed, in that memorandum, notably, Secretary Mayorkas states that a key predicate of any use of the contiguous territory return authority under the statute is the ability for individuals returned to that foreign territory to participate in removal proceedings. And the Secretary acknowledged that the reality of the implementation of MPP 1.0, again, we're talking about this particular policy, was such that it did not meet that key predicate for a lawful exercise of the government's contiguous territory return authority under 1225 B2C. Counsel, can I turn to the standing argument? Because I, you know, I think courts and judges are trying to grapple with Hippocratic medicine. I mean, you know, the difficulty here is you, you know, you made your standing arguments before it developed your evidence, before Hippocratic medicine came down, Hippocratic medicine came down. As you navigate, as they navigate that, it seems like what Hippocratic medicine has said is diversion of resources is no longer a cognizable injury for organizational standing, but core business effect is. And the Supreme Court has been so helpful because it's never told us what core business is. Is it fair to say, I mean, first of all, you raised your arguments and I don't blame you for that because our circuit precedent said diversion of resources was cognizable at the time, but that's really where you focused your arguments around diversion of resources, right? So your honor is correct that we applied that binding legal standard at the time in terms of analyzing the facts that established MDEF's organizational standing. Yes. But how can we apply diversion of resources after Hippocratic medicine when the Supreme Court said diversion of resources is no longer good? Now, now you're trying to take what you said were diversion of resources. And as I understand it kind of fit them within this core business effect. But I mean, it seems like circumventing Hippocratic medicine to take what previously were diversion of resources injuries, which were previously cognizable now are not, and then say, well, we can just get to the same result by relying on the core business language that the Supreme Court has said theoretically could be cognizable. I guess a follow-up, is there enough facts in the record that the district judge would allow that we would look to, to establish despite the arguments or the law being looked at was diversion of resources, to also substantiate interference with core business activities? Thank you both. So, so the answer to that last question is, is yes, there is, there is enough factual evidence in the record to establish standing. Can you highlight exactly what that is? Yes. So I, I would point the court to the numerous declarations that have been submitted in evidence including multiple declarations at the class certification and preliminary injunction stage by Margaret Cargioli, the recent Todlowski and Cargioli declarations. But what are you relying on specifically there? Because what's interesting to me is those are all, those declarations all talked about diversion of resources. And it seems like all you're doing is taking a diversion of resources label and now stamping core business interference on it. And I'm like, well, wait, is that what the Supreme Court meant? That as long as you relabel it, you're okay? I understand your Honor's point. What I would say is that the important inquiry here is what are the facts? And so in some cases, there may be organizations who could establish standing under the prior test who cannot under the current test. That's not MDEF. Here, the facts that establish standing have not changed. And the facts are... What are those? Maybe you're going to go into them, but what, what are those specifically? Yes. So, so MDEF's core business activities, whether you want to label them core business activities or their main work or their essential activities, it's providing direct representation, counseling, and legal assistance to non-citizens and removal proceedings in and around Southern California. That, that hasn't changed. They're providing legal services to non-citizens, many of whom are seeking protection in this particular area. Because I think you cut out, you said in and around California, Southern California, which made sense because that's where they were ending up. Now they're not, now they're no longer in Southern California. Now they're in Mexico. Why doesn't that mean that's not a core business practice? That's not a core, sorry, business. I forget that I'm blanking on, you know, core business activity, because you weren't providing those services in Mexico at the time. So this is a framing question, your honor. Government counsel would say that this is a voluntary expansion of services, but what MDEF has said in its sworn statements in the factual record is that in order to continue serving its core constituency, so those are the individuals and non-citizens and removal proceedings who would have come absent the government's implementation of MPP to Southern California, in order to continue serving those same individuals who are seeking protection, MDEF had to change its practices in order to continue providing them with legal assistance because the U.S. government had implemented MPP 1.0, which meant that those individuals, MDEF's client base, who are coming to Southern California, are now being turned around at the port of entry and returned. So let me ask you a couple of hypotheticals, because I'm trying to figure out how we would distinguish your client. I mean, you're providing legal services, right? You're basically a law firm providing legal services to these immigrants. Is that right? Is there more that I'm missing than just legal services? So MDEF provides legal services, which include counseling, legal assistance, know your rights, so variations on that. But yes, MDEF's mission is to provide universal representation. Let's say that the government had a policy of detaining immigrants in Southern California, and you built your business around providing that legal services to them in Southern California. Let's take Mexico out of the equation. Let's say the government came in and said, well, it turns out that the California detention facilities are all full, but we have some in Florida that are available. We are going to take immigrants, new incoming immigrants who previously would have been detained in Southern California, and we're going to send them to Florida. Would you have standing to challenge, because now you have to open up a Florida office, you have to divert resources to Florida, would you have standing to challenge their policy of housing and detaining these immigrants in Florida as opposed to California under that scenario? So under that scenario, which isn't this case, but I think it would depend, Your Honor, on the harms that were actually present in the records. So if IMDEF... What harms? Harms to who? To IMDEF. I believe you're talking about whether IMDEF would have standing. So would IMDEF's attorneys be able to provide the same zealous representation to those individuals, notwithstanding their transfer somewhere else in the United States? Would that transfer actually harm the organization? How would it harm the organization? Those would be questions to ask in that scenario. And I think the relevance here is that the district court has asked those questions, has applied the correct law, and in its judgment found that the facts on this record show that return to Mexico did harm IMDEF's ability to provide legal services. Well, let's be clear, applying the correct law, that's clearly not true because it didn't have the benefit of Hippocratic medicine. Whether you still survive under Hippocratic medicine is a separate question. But I don't think it's fair to say that the district court applied the correct law because it didn't. I mean, you agree that the district court did not apply Hippocratic medicine, did it? In its state decision, it did apply Hippocratic medicine, Your Honor. And it said it still survives under Hippocratic medicine. Correct. OK, OK. So my hypothetical of Florida, would you say that you would you would not have standing because, hey, it's easy to get on a plane? I'm just trying to figure out what your what your base, what your standing is based on. Is it based on the increased cost or the diversion of cost that comes into play? Or is it based on there's separate harms, as I understand it, that, hey, it's actually logistically complicated to get down to Mexico. And I'm trying to figure out where you're putting your standing bucket. Arguments, so there there are multiple buckets of harm, so one is certainly financial, I believe in one of the declarations submitted by IMDEF, they talk about four hundred thousand dollars extra that they needed to spend in order to represent clients because of impediments placed by by MPP 1.0. Some of it is certainly logistical. As to that, if it costs four hundred thousand dollars more to the bottom line to represent the same clients that would have come to California and they're in Florida, would you have standing in that scenario? I think, again, it would depend. And is four hundred thousand dollars of financial injury sufficient for standing? I would I would say yes. If it's if it's a cost that is being expended in order to continue carrying out core business activities, then then, yeah. So where does this end? Because if, say, Gibson Dunn does a pro bono program and they're representing immigrants and the same thing happens and Gibson Dunn has to spend four hundred thousand dollars more to go to Florida or go to Mexico. They have injury. I mean, every law firm has an injury when it's harder for them to represent clients. So I understand you're going to be asking for a limited, limiting principle. And I would say the limiting principle here is the facts in the record of how IMDEF has been harmed. And here there are multiple. But that's what I am asking about. And I'm trying to figure out if money alone is enough. And you kind of are waffling because you're saying, well, yes, but then you don't want to answer whether harm, whether four hundred thousand dollars increased costs would be harmed. I mean, if it's a harm to you, IMDEF, it has to be a harm to any other law firm that faces the same problem. And that can't be the law. Can it? Wouldn't standing, I can ask you, wouldn't standing depend on whether that transfer is actually violating the INAI's provision regarding right to counsel? And we're talking about the hypothetical transfers to Florida. Well, the one that's being asked here, see, I'm not, I just want to make sure, are you incorporating or is there sufficient incorporation of the INAI's provision regarding the right to counsel in that scenario? And I guess, second, in light of the questions that Judge Nelson was asking you, is there injury beyond the financial injury? So to that last point, yes, there is injury beyond the financial injury. Well, we answered the first question. She asked you whether the right to counsel is one of the injuries. Does IMDEF have any right to counsel under the INAI? Well, the provision regarding INAI, which allows people to have a right to counsel and then IMDEF's mission in light of that. So I should have been more specific and what their core business activity is relating to the INAI, allowing someone to have right to counsel. Okay. So I'm going to try to take these questions in turn, if I may, and please let me know if I miss any. And so to the question of whether some violation of the INAI would need to be present in order for IMDEF to sue in this hypothetical scenario, the answer would be yes, there needs to be some sort of violation of law, of course, that would give rise to a challenge in the hypothetical scenario of a transfer to Florida. And here, plaintiffs have sufficiently pled the violations of law that MPP 1.0 is carrying out. And in terms of whether the right to counsel runs to IMDEF, so the right to counsel is enshrined in the INA and IMDEF is an appropriate party to sue on behalf of, in terms of that right, because they fall under the zone of interest of the statute with which the district court correctly. Wait, wait, wait, wait, back up. How do they fall within the zone of interest? IMDEF has no right to counsel, right? So IMDEF is the counsel. You're claiming the rights to your client. You're claiming your client's rights. So you're not asserting the associational standing, are you? No, Your Honor, but IMDEF has a legally protected interest here to sue under the INA. And I would. Whoa, whoa, whoa, whoa, where does that come from? I mean, under that position, every attorney has a legally protected interest to sue for violations of their client's rights. That doesn't make any sense. So what does make sense is that legal service providers whose role is envisioned in the INA, and I see my time has expired, may I go ahead? Thank you. That they fall, those legal service providers have been found correctly by the district court and other, I believe the circuit as well, to fall within the INA's zone of interest. And so they are able to sue under the statute. And actually at this stage in the proceedings, I don't believe, I'm not sure that the government's continued to raise the zone of interest argument here. But I would point you to the district court's decision finding that IMDEF squarely falls within the zone of interest in the INA as a party that can sue to enforce those rights because of its interests in the immigration system. How are those interests any different than any other law firm representing any client? I mean, IMDEF, you want an exception to say IMDEF is different, I guess, because you have some sort of internal mission. But Gibson Dunn providing legal services, they have the same interest in their clients. So they have standing to sue for violations of their client's interests without their client or not even the client, potential future clients. So whether IMDEF's claims fall within the zone of interest of the relevant statute here, the statute here, the INA, that's a prudential inquiry that asks whether the statute grants a plaintiff here, IMDEF, the cause of action that he asserts. So in the East Bay Sanctuary Covenant v. Trump case, the Ninth Circuit upheld this very clearly, that saying that although legal service organizations who are focused on providing services to immigrants, although those organizations are neither directly regulated nor benefited by the INA, their interest in, quote, providing the asylum services they were formed to provide falls within the zone of interest protected by the statute. And that was before Hippocratic Medicine, correct? Yes, but that did not pertain to that. That was not part of the diversion of resources inquiry. That was a separate aspect of the decision, and that was the zone of interest test, which again is a prudential inquiry. Can I ask you, what would the government here have to do to enact the MPP that complies with and respects the INA's right to apply for asylum with the privilege of counsel? That is an excellent question, Your Honor, and the answer is not MPP 1.0. But what the government would need to do would be to take into account the conditions to which they are returning individuals and the operation of the program, and whether or not through that operation of the program in its context with whatever foreign country is being involved there, whether individuals return to that contiguous territory could meaningfully access the other rights in the statute, because as defendants themselves admit, it must, this contiguous return authority must be read in conjunction with the rest of the statute. And that's particularly true here because individuals who are subjected to MPP are legally in the custody of the U.S. government. That's under, the district court found that in the motion to dismiss order, and that's under 8 CFR 235.3D. So in the context of placing individuals into a contiguous territory return policy, the government does have the responsibility to ensure that they can still access the other rights under the statute when they are being placed in that program by the government. And a separate sort of question is, do you think DH here adequately explained its reasoning as to how and why it re-implemented the Remain in Mexico policy? If not, are you intending to try to file an amended complaint and bring a procedural APA claim or, that challenges the soundness of the reason? Or what, what's, what's your response to that? So there was very little, very little explanation in the re-implementation decision. Although the decision stated that facts on the ground are favorable, there was no further explanation. But plaintiff, understand that the district court was correct in finding that this re-implementation can be stayed under the scope of our current second amended complaint, because applying the Ninth Circuit's precedent in Pacific Radiation Oncology, there's a clear nexus between the injury that is claimed in plaintiff's stay motion and the conduct that's asserted in MDEF's operative complaint. Again, that's because the policy here that's being re-implemented is the same based on everything we have in the record. It is the 2019 implementation of MPP 1.0. And so the district court correctly held that amendment's not necessary in the case, that there's no meaningful difference between the 2019 version of MPP 1.0 before and the re-implementation here based on what we know. So I, I understand that you're not challenging the notion of any contiguous territory policy is, is problematic. What, what is it about MPP in particular and its re-implementation that is specific to this program that is causing the violations of the INA? Absolutely, Your Honor. So I, I would say actually many of the things I'm about to list are documented very well by defendants themselves. Again, in that October 2021 termination memo and the, the explanation memo. But the, the ways in which MPP violates the constitution and, and rights under the INA include the, the limitation on attorney's speech with their client to just one hour before immigration court hearings in the United States, the restriction that attorneys may not communicate with prospective clients at immigration court, the failure to provide confidential meeting spaces for attorneys to meet with their clients in MPP when they attend their immigration court hearings, the failure to provide actually substantively meaningful pro bono attorney lists to non-citizens, which would provide a list of counsel who actually were able to take MPP cases or US asylum cases in Mexico, the widespread lack of notice under the program to individuals of their hearings, the requirement that to attend their hearings, individuals had to report to ports of entry in the middle of the night, requiring them to travel in a very dangerous time in a way that made them conspicuously vulnerable targets to cartels. And indeed many individuals were even removed in absentia because they were kidnapped on their way to the port of entry for their hearings. And what if, I mean, what if the government is aware that there's violence along the border in Mexico, but it's the US government is not the Mexican government and it can't control those conditions of violence. What then, how does that affect, if that impacts meaningful access to the asylum system process, but the US government has no control over the border, what do we make of that? So I agree with your honor that the US government does not control conditions in Mexico, but the US government does control whether it chooses to use its contiguous territory return policy in a particular manner. And as the district court aptly pointed out, that the government cannot place restrictions on attorney client communication by placing people in MPP 1.0 and then claim no responsibility for that. And again, this is, you know, I would point the court again to the fact that individuals in MPP are legally in custody of the US government. So when, when government counsel seeks to distinguish cases like Arantas Hernandez v. Thornburg, we would actually say those cases are incredibly apt here because just as there, the US government has a responsibility to the individuals who are returned to Mexico to ensure that they are able to access their procedural rights. The US government can choose not to return them to Mexico, certainly. But if the US government chooses to do so, there is a responsibility there in order to lawfully use its contiguous territory return authority that they ensure that those individuals can access counsel as also guaranteed under the INA, can access the meaningful right to seek asylum as also guaranteed under the INA. Well, let me ask this because I intend to ask your friend on the other side. One of the new arguments raised in the merits briefing is that the only type of way to challenge what is going on is through a petition for review process. I wanted to give you a chance to respond to that. Why, why do you think that's wrong that MDEF isn't able to challenge it itself? So, you know, the PFR process, the petition for review process is, is not actually available to individuals in MPP because individuals were actually seeking access to the very adjudication system that provides the PFR process. And so the district court correctly concluded that jurisdictional bars in the INA that have to do with petitions for review don't apply here because there's no challenge to a specific basis of an order of removal in this case. Rather, the challenge is about individuals seeking to avail themselves of the administrative system that exists to litigate their immigration cases, which renders their claims independent of or collateral to the removal process. I mean, I think there's a bigger problem just to tell you what I think, but even if an individual was subject to the removal process, if they raise an APA claim, the BIA can't adjudicate it. That's not something that the agency can do. It has to be a federal court that addresses whether the government is violating the APA or not. So it seems the wrong channel to try to do it through a PFR, through a removal process, and then, and then circuit review. I would agree, Your Honor. And certainly the remedies that are being sought in this case are not remedies that could be granted through the petition for review process, which ultimately is about an individual moving through on their removal order. And moreover, the district court did aptly point out that the PFR process is not available to an organizational plaintiff like IMDEF here, citing to the Las Americas Immigrant Advocacy Center case in the District of Oregon. And so allowing an organizational plaintiff like IMDEF to allege systemic problems here, independent of any specific removal orders, does not thwart the purpose of the jurisdictional bars in the INA. And again, all of this needs to be read against the strong presumption of judicial review, absent clear legislative intent. Any other questions? No. All right. Thank you very much. Thank you. Ms. Wilson, I'll give you five minutes if you need it. Thank you, Your Honor. I'll try to be brief. I'd like to start where my friend started, which was disambiguating exactly what is being challenged here. I believe, I believe IMDEF is saying that they are challenging MPP 1.0. That is a change of position to the extent that's what they're saying. As we explain on pages eight and nine of our reply brief, citing several portions of the record, for example, their stay motion at 2 ER 176 says that they are requesting, quote, that this court stay the re-implementation of MPP 1.0 and of course, all the briefing on final agency action, which is attempted to set up the re-implementation announced in the January 21st, 2025 press release as a separate final agency action. All of that is beside the point if all along IMDEF has really been challenging MPP 1.0 itself. And I take the reason that, that IMDEF chose to, to challenge re-implementation as a putatively separate final agency action is one to distance itself from the Supreme Court's stay of a previous attempt to take MPP offline. And two, to, to lessen the apparent risk of conflict with the Northern District of Texas's universal 705 stay. I'd like to also touch briefly on standing, just a couple of quick points. The, the problem with IMDEF's argument that, that re-implementation affects its core business activities is its own statement at 2 ER 205, for example. Saying that it made the changes in response to MPP quote, at the expense of its core programs, indicating that they are not itself, they are not themselves IMDEF's core programs. I'd also point the court to Alliance for Democratic- I guess what I'm, just to, what I'm struggling with, and I was listening very intently with Judge Nelson's colloquy with your, with counsel on the other side, I, to, I, I'm having a tough time figuring out what would be a core business activity injury if it didn't involve some sort of a reaction to a policy that the government implements. And so if, if at the end of the day, we keep going down the road of, well, you spent money, but that was in response to this, and so you're buying your way into it, when then, can you elaborate for me, what is a core business activity injury that doesn't involve something that involvess the organization reacting to the thing that they're challenging? So I would say at the outset, it should be hard to think of those examples. And Alliance for Hippocratic Medicine acknowledges that by saying that Havens is a quote, unusual case. So it should be something odd when the party that's not itself being, uh, the subject of regulation, uh, has nonetheless an injury to its core business activities that allows it to sue in its own right. But be that as it may, I mean, as Judge Nelson pointed out, Hippocratic core business activity injuries, but not, you know, buying your way into, into standing. So what, what, what is the core business activity prong of this that we should look at in order to analyze this one way or the other? I think the other difficulty is coming from the fact that the Supreme Court hasn't told us what core business activities are, uh, and that this case wasn't litigated with core business activities in mind as the touchstone of what would give the organization standing. So I think those, that's why it's difficult. I'm hesitant, uh, as organizational standing cases are being litigated in light of Alliance, uh, for Hippocratic Medicine to, to affirmatively offer what I think would be sufficient other than just pointing back to Havens, where what the, what the organization did was provide information about housing and what injured it was receiving false information about housing so that it wasn't then able to do that thing that it had always been doing. So here, if the government provided false information to, um, uh, to immigrate defenders, supposedly, you know, that, that, you know, and said, Hey, we're actually detaining these people, you know, in, in Eastern Mexico. And it turns out it's all in Western Mexico, that, that might be organizational standing. Um, I, I think so, Your Honor. I'm not sure I followed, um, all the details of that. Well, I'm just trying to analogize this to Havens. I'm not sure there is an analogy because I'm not sure that the government owes, uh, information to them. But if the government were lying to, you know, or providing false information, which is not an allegation here, to be clear, but if the government were providing false information as was provided in Havens, perhaps that would, that at least would address perhaps the hypothetical that, you know, we're seeking for where there's organizational standing because they're actually injured by false information that's being provided. Right. I think, I think that's right, Your Honor. So I, just to put a little bit more flesh on the bones, I think two things would make it easier to say something is a core business activity. One would be if the organization has been doing it all along, if you could look at the activity and say, Oh, that's, this is what the organization does. And it's continuing to do that thing after the, the change that it's challenging. But, uh, and I'm sorry, I'm now forgetting what the second one was going to be, but I would, I would point back to the statement in Alliance for Hippocratic Medicine at 394, that it's not enough if an action impairs the organization's ability to provide services and achieve its organizational mission. So I guess that would, that was the second one was that it's not something abstract, it's not a sort of general statement of the organization's mission, the thing that it hopes to achieve, but you're looking at what it's actually doing on the ground. So I think those would be two things to help clarify that. Well, I guess I'm in trying to figure out with the, with what we have in Hippocratic Medicine, the core business activity part of this, any, we don't look to expenditure of money at all or solely. Um, so I, I think it's not the case that expenditure of money, making an activity more expensive, uh, will always be irrelevant. Um, I think it can be helpful to illustrate that the, that the organization is being concretely harmed in what it's been doing all along, but, but just a version of resources is clearly not sufficient. Uh, I, I understand that. Uh, it seems like MDEF here had to spend more money and resources on this, but I'm trying to figure this out, to keep affecting its mission, which in its view is its core business activity of representing, uh, direct representation of immigrants, but also educational and consultation and other, you know, an umbrella of, of those sorts of, uh, issues. That correlate, I guess, to the INA provision that gives asylum seekers the right to counsel. It seems that that's at least different from the doctors who were trying to, um, achieve standing in Hippocratic Medicine. So as for what MDEF has done and the evidence on the record, I think we should take MDEF at its word, uh, which is that it began representing a different population, began doing cross-border activities. So in a different place from a newly opened office, and that it did all of that in its own words, in response to, uh, MPP and Alliance for Hippocratic Medicine tells us that phrase in response to, this is page 395 of the opinion, is not sufficient to establish standing. When an, when an organization does that, it's not sufficient to establish the powers of organizational standing wide open. But that to me, and again, I mean, we would just may just disagree on this, but that was in the context of just spending money to, to advocate a policy that, uh, that wasn't enough there. Um, they, I think they were trying to achieve standing by just spending money to advocate against the MIP, MIPPRESTO. So that may be a distinction. I guess we'll have to see where we land on this, but, uh, thank you. Unless you have anything else. Um, thank you very much. Thank you both. Um, you know, this is a special setting for, to hear this, uh, case, but I very much appreciate on behalf of the court, uh, your oral argument presentations here today, Ms. Hellegren and Ms. Welch. Thank you so much. Uh, the case of Immigrant Defender Law Center, uh, versus Kristi Noem, Secretary, Department of Homeland Security is now submitted and we are adjourned. Thank you.
judges: MURGUIA, NELSON, SANCHEZ